## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| CAROL KIRKLAND, | ) | |
| | ) | Case No. 3:13-cv-424 |
| Plaintiff, | ) | |
| | ) | Judge Thomas M. Rose |
| v. | ) | |
| | ) | |
| DEBORAH LEE JAMES, SECRETARY | ) | |
| OF THE AIR FORCE, | ) | |
| | ) | |
| Defendant. | ) | |

---

### ENTRY AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. 15)

---

This employment discrimination case is before the Court on the Motion for Summary Judgment (Doc. 15) filed by Defendant Deborah Lee James, Secretary of the United States Air Force ("Defendant"). Plaintiff Carol A. Kirkland ("Plaintiff"), an Air Force employee, alleges that Defendant improperly denied restoration of her leave hours and refused to increase the total number of leave hours that she is permitted to carry on an annual basis. Plaintiff alleges that these actions constituted gender-based discrimination and were taken in retaliation for a prior discrimination complaint in violation of Title VII of the Civil Rights Act of 1964. Plaintiff filed an opposition to Defendant's Motion for Summary Judgment, in response to which Defendant filed a reply. (Docs. 19, 23.) The Motion for Summary Judgment is therefore fully briefed and ripe for the Court's review. For the reasons discussed below, the Court **GRANTS** the Motion for Summary Judgment.

## I.     BACKGROUND

This case involves a dispute about Plaintiff's accrual of leave hours as an Air Force

employee. Air Force employees accrue a certain number of leave hours, based on their total years of service, for every biweekly pay period that they work. 5 U.S.C § 6303. Subject to certain exceptions, Air Force employees may accumulate no more than 30 days (or 240 hours) of leave. 5 U.S.C. § 6304(a). If an employee accumulates more than 240 hours of leave, she must use the leave hours in excess of the 240-hour threshold by the end of the year or they will be forfeited. *Id.* The hours that an employee carries above the 240-hour threshold are therefore referred to as "use or lose" hours because, if they are not used by year end, they are lost.

**A. Plaintiff's Deployment to Camp Lemonnier in Djibouti, Africa**

During the period relevant to this lawsuit, Plaintiff was a Program Manager, Directorate of Intelligence and Requirements, at Wright-Patterson Air Force Base in Ohio. (Doc. 19-1, ¶ 1.) On November 21, 2010, Plaintiff was deployed on temporary duty (referred to as "TDY") to Camp Lemonnier in Djibouti, Africa. (Doc. 19-1, ¶ 2.) Because Plaintiff was on TDY while in Djibouti, her official station remained Wright-Patterson Air Force Base. In contrast, when assigned to a temporary change of station ("TCS") or permanent change of station ("PCS"), an employee's station changes from their current location to the new location where they are transferred. Here, it is undisputed that Plaintiff's station never changed during her deployment.

On November 9, 2010, prior to her deployment, Plaintiff sent an email to Kathy Taylor, Plaintiff's Timekeeper and Customer Service Representative, asking if Taylor was "the person I need to see to ensure my current leave hours earned is froze (will not be lost)?" (Doc. 19-1, Ex. 1.) As of November 2010, Plaintiff had accrued 104 "use or lose" hours, *i.e.*, 104 leave hours above the 240-hour threshold. (*Id.*) Taylor replied that, after returning from deployment, Plaintiff's "use or lose" hours would be "automatically restored without us having to process any

2

paperwork." (*Id.* (citing a December 3, 1999 Memo for Directors of Personnel and Agency Payroll Offices (CPM-99-5)).) In response to another email from Plaintiff dated December 10, 2010, Taylor reiterated the same guidance and provided Plaintiff the telephone number for Defense Finance and Accounting Services in Indianapolis "to see if they can answer your question regarding use or lose." (*Id.*, Ex. 2.)

On June 3, 2011, Plaintiff returned from her deployment. On July 7, 2011, Taylor sent an email to Molly Holtzapple, a Human Resource Specialist, asking for assistance with Plaintiff's "question about getting 104 hours of use or lose leave restored." (Doc. 19-1, Ex. 3.) Taylor explained that the "only guidance I could find (which I emailed to her when she first deployed) is this excerpt from the December 3, 1999 Memo for Directors of Personnel and Agency Payroll Offices (CPM 99-5), stating use/lose will be automatically restored without us having to process any paperwork – is that still true?" (*Id.*)

Holtzapple replied to Taylor on the same day. Holtzapple stated:

I found the guidance in the United States Code to confirm that if Carol Kirkland was in an emergency essential status (which she was) and deployed to a combat zone (yes again) she is entitled to the restoration of any annual leave that was lost. The reg is quoted below for your reference. Please let me know if you need anything else.

(*Id.* (including quote from 5 U.S.C. § 6304(d)(3)(B)(4)).) Subsequent to this email, Taylor restored the 104 "use or lose" hours that Plaintiff forfeited while deployed by placing them in a Restored Annual Leave ("RAL") account.[1] (Doc. 19-1, ¶¶ 8-9.)

Between June 3, 2011 (when Plaintiff returned from deployment) and the end of 2011,

---

1 A Restored Annual Leave ("RAL") account is an account that "may be established when annual leave in excess of the maximum amount an employee may carry into the next leave year is lost because of 'exigencies of service' and the leave was scheduled in advance." (Doc. 15-1, ¶¶ 2-3 (citing Air Force Instruction (AFI) 36-815, Absence and Leave, Chapter 2, and 5 U.S.C. § 6304(d)(1)(B)).)

Plaintiff used a total of 188.5 leave hours. (Doc. 15-1, Ex. 2) During the same period, Plaintiff also made three requests for Taylor to place additional leave hours in her RAL account. (Doc. 19-1, ¶¶ 8-9.) Plaintiff reasoned that, due to her deployment, she was entitled to restoration of the additional leave hours because they were "use or lose" hours—hours that she was carrying over the 240-hour threshold at the time of her requests. (*Id.* at ¶ 14; Doc. 15-1, Ex. 2.)

At some point between June 2011 and February 2012, Plaintiff also asked Taylor to increase her leave ceiling from 240 hours to 360 hours. (Doc. 19-1, ¶ 12.) Plaintiff again reasoned that she was entitled to this modification based on her deployment. (Doc. 15-1, Ex. 3 (citing Title 5 U.S.C. Chapter 63).) Taylor did not act on this request.

On or about September 13, 2011, Nellie Saylor, a Human Resources Specialist in Employee Relations, was notified of Plaintiff's requests relating to her leave hours. (Doc. 15-2 at 3.) Saylor asked Taylor to provide information about the restoration of Plaintiff's leave hours, including "what research was done to determine her eligibility and who conducted the research as well as any documentation [she] may have." (Doc. 19-1, Ex. 4.) Beginning in February 2012, Saylor and Sue Nelson, who is also a Human Resource Specialist in Employee Relations, began asking Plaintiff questions relating to her leave hours. (Doc. 19-1, ¶¶ 12-17.) Plaintiff told Saylor that she was working through "some leave corrections and adjustments" with Taylor, and that Taylor was in the process of increasing her leave ceiling. (*Id.* at ¶ 12.) From February through April 2012, Saylor and Nelson asked Plaintiff various questions by telephone and email regarding her eligibility to have her "use or lose" leave hours restored. (*Id.*) Around May 2012, Nelson took over sole responsibility for resolving any issues regarding Plaintiff's leave hours due to Saylor's heavy workload. (Doc. 15-1, ¶¶ 2-4.)

4

In June 2012, Nelson asked Plaintiff to provide more documentation, such as her deployment orders and Leave and Earnings Statements.  (Doc. 15-1, ¶ 5.)  After reviewing Plaintiff's records, on June 21, 2012, Nelson sent an email to Plaintiff stating that the proper procedures were not followed to restore the 104 "use or lose" hours that she forfeited in 2010. (Doc. 19-1, Ex. 5.)  Specifically, Taylor had restored Plaintiff's "use or lose" hours without approval of "the designated agency official in Civilian Personnel."  (*Id.*)  Nelson explained that the "Civilian Personnel staffing specialist" (Holtzapple) that informed Taylor that she could restore the leave hours without such approval "was not familiar with the leave restoration process." (*Id.*)  In addition, there was no documentation supporting Taylor's placement of additional leave hours from 2011 in Plaintiff's RAL account.   (*Id.*)

On June 21, 2012, Plaintiff responded to Nelson by email.  (Doc. 15-1, Ex. 3.)  Plaintiff argued that Taylor properly restored 104 of her leave hours from 2010 because the Office of Personnel Management's regulations state that employees necessary for a national emergency are "entitled to have their excess annual leave restored without the administrative burden of scheduling and canceling such leave."   Plaintiff acknowledged that Taylor "accomplished" the restoration, but did not address Nelson's assertion that the restoration needed to be approved by an official in Civilian Personnel.

In her June 21, 2012 email, Plaintiff also argued that she was entitled to restoration of 208 leave hours from 2011.  (*Id.*)  As of June 2011 (when Plaintiff returned from deployment), she was projected to have a total of 208 "use or lose" leave hours in 2011.[2]  Plaintiff claimed that she could not use those hours because she was deployed and was therefore entitled to their restoration.

_____

[2] Based on Plaintiff's Master Leave History, the accuracy of which is not in dispute, the 208 "use or lose" hours includes 88 leave hours that Plaintiff accrued through June 4, 2011, plus 120 leave hours that Plaintiff was projected to accrue between June 4, 2011 and December 31, 2011.   (Doc. 15-1, Ex. 2.)

Plaintiff also argued that her leave ceiling should be increased to 312 hours to accommodate her restored leave hours (104 leave hours from 2010 + 208 leave hours from 2011 = 312). (*Id.* (citing 5 USC Chapter 63).)

On June 27, 2012, Nelson replied to Plaintiff's email. (*Id.*) Nelson stated that Plaintiff was eligible for restoration of the 104 "use or lose" leave hours from 2010 that she forfeited. However, as the proper procedures for their restoration were not followed, Nelson offered to prepare the appropriate documentation for Plaintiff's signature. Nelson also explained that the 208 "use or lose" hours that Plaintiff accrued in 2011 could not be restored because most of those hours were never forfeited. Nelson noted that Plaintiff took 188.5 hours of leave in 2011; as a result, she forfeited only 19.5 "use or lose" hours (208 - 188.5) that year. (*Id.*) Nelson offered to assist Plaintiff with a request for restoration of the 19.5 "use or lose" hours, but Plaintiff would need to show that "the 19.5 hours forfeited was [sic] scheduled/approved and cancelled due to an exigency for leave year ending 2011." (*Id.*) Nelson explained that Plaintiff was not entitled to an increase in her leave ceiling because she was on TDY in Djibouti. In contrast, explained Nelson, employees assigned to a temporary change in duty station (referred to as "TCS") may have their leave ceiling increased. (*Id.*)

On July 6, 2012, Nelson sent a follow-up email to Plaintiff letting her know that her signature was required to process restoration of the 104 "use or lose" hours that she forfeited. (Ex. 15-1, Ex. 9.) Nelson also explained again that, under 5 U.S.C. § 6304(b), only employees whose official post is located outside the United States are permitted to increase their leave ceiling. While Plaintiff was deployed on TDY in Djibouti, her official post remained Wright-Patterson Air Force Base in Ohio. (*Id.*)

6

On July 16, 2012, Nelson sent an email to the Air Force Civilian Deployment Program Management Branch requesting further guidance on the issue of whether employees on TDY are entitled to an increase of their leave ceiling above 240 hours.  (Doc. 15-1, Ex. 7.)  Nelson explained that this issue was relevant to her handling of the leave accruals for two employees, Plaintiff and an employee named Dwaine Young.  (*Id.*)  Cynthia Dale, an "Air Force Civilian Awards; Absence & Leave; Performance Program Manager," responded that "employees in a TDY from a duty station in the U.S. will experience no change to their leave accrual and carryover, and will be limited to the normal 240 hours."  (*Id.*)

On September 18, 2012, Nelson and her supervisor, Brenda Thomas, held an in-person meeting with Plaintiff to discuss the issues regarding her leave hours.  (Doc. 15-1, ¶ 14; Doc. 19-1, ¶ 28.)  During the meeting, Plaintiff "claimed her supervisor in 2011, Mr. Daniel Faulkner, cancelled a leave request resulting in the loss of the 19.5 hours" at the end of 2011.  (Doc. 15-1, ¶ 14.)  Plaintiff said that she would provide documentation to Nelson supporting both the 104 hours that she lost in 2010 and the 19.5 hours lost in 2011.  (*Id.*)  On the next day, however, Plaintiff emailed Nelson and Thomas only "an extract of 5 U.S.C. § 6304(b) and asserted that the statute provided sufficient grounds for restoring the leave."  (*Id.*)

After the meeting, Thomas and Nelson confirmed that their interpretations of the rules applicable to civilian deployment and leave restoration were correct by seeking clarification from Headquarters Air Force and Air Force Materiel Command.  (Doc. 15-1, ¶¶ 10, 15 and Ex. 6.)

On October 24, 2012, Ms. Robin Williams, Chief of Labor & Employee Management Relations, Civilian Personnel Office (and Nelson's second-level supervisor), issued a memorandum to Plaintiff addressing the leave restoration and leave ceiling issues that had been

raised. (Doc. 15-1, ¶ 15 and Ex. 11.) As Nelson previously informed Plaintiff, Williams stated that, under 5 U.S.C. § 6304(b), Plaintiff was not entitled to an increase in her leave ceiling because she was on a TDY assignment in Djibouti, not a TCS assignment (where the employee's official post changes). (*Id.*) Williams then discussed the additional leave hours from 2011 that Taylor had restored for Plaintiff. Williams stated that her office "did not have a request for leave restoration package on file; therefore, [they] conducted an audit of [Plaintiff's] 2011 Master Leave History to determine how much annual leave met the requirements for restoration." (*Id.*) Williams' office "determined that the annual leave was restored in error and without documentation or proper written authorization" pursuant to Air Force rules and procedures. (*Id.*) Williams calculated, just as Nelson had, that Plaintiff forfeited only 19.5 "use or lose" leave hours in 2011, and had not submitted a proper leave restoration request or any documentation supporting the restoration of those hours. (*Id.*) Williams stated that a total of 89.5 leave hours from 2011 were improperly restored because they were never forfeited; and, as a result, those hours would be removed from her RAL account. (*Id.*) Williams further stated that Plaintiff had "not established that [she] had a valid exigency for the 19.5 hours of annual leave forfeited at the end of leave year 2011," but that Plaintiff could request restoration of those hours pursuant to the Procedures for Cancellation and Restoration of Civilian "Use or Lose" Annual Leave – Leave Year 2011, dated September, 21 2011, and Air Force Instruction 36-815. (*Id.*)

**B. Plaintiff's EEO Complaint Against Her Supervisor**

In July 2011, Plaintiff submitted an informal Equal Employment Opportunity (EEO) grievance against her supervisor, Daniel Faulkner. (Doc. 19-1, ¶ 7.) In November 2011, Plaintiff formally filed the EEO grievance. (*Id.*, ¶ 11.) The EEO grievance contained allegations

8

that Faulkner gave her an insufficient performance rating, unfairly moved to pursue discipline against her, and unfairly took actions regarding her pay.  (Doc. 17 at 20-21.)

Plaintiff alleges that Saylor and Nelson, in their capacities as Employee Management Relations representatives, provided Faulkner guidance and support in response to the EEO grievance.  (*Id.*)  On July 23, 2012, Saylor and Nelson also attended the mediation regarding Plaintiff's claims against Faulkner.  (*Id.*, ¶ 25.)  At the mediation, "[t]hey spoke and provided information on Mr. Faulkner's behalf."  (*Id.*)  Plaintiff claims that she "prevailed" on her claims against Faulkner at the mediation.  (*Id.*)

Approximately one week after the mediation, Plaintiff was removed from working under Faulkner's supervision.  (*Id.*, ¶ 27.)  Plaintiff was assigned to a new interim supervisor named Donald Kruszynski.  (*Id.*)  Taylor remained Plaintiff's Customer Service Representative and Timekeeper, but she was not responsible for handling Plaintiff's leave hour issues.  (*Id.*)

### C.  Plaintiff's Complaint

On December 23, 2013, Plaintiff initiated this action by filing her original Complaint. (Doc. 1.)  On January 22, 2014, Plaintiff filed an Amended Discrimination Complaint (Doc. 4), and, on February 27, 2014, Plaintiff filed a Second Amended Discrimination Complaint (Doc. 6), which is the current complaint in this action.

The Second Amended Discrimination Complaint contains only one count, which alleges that Defendant "denied Plaintiff equal terms, conditions and privileges of employment because of retaliation and sex" in violation of Title VII of the Civil Rights Act of 1964.  (Doc. 6, ¶ 17.) Plaintiff thus asserts two claims in the Second Amended Discrimination Complaint:  one for discrimination based on sex under Title VII, and another for retaliation for engaging in a protected

activity under Title VII.

## II.     LEGAL STANDARD ON MOTION FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir.1992) (quoting *Anderson*, 477 U.S. at 250).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).   The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)).   Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.   It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).   Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position.  *Celotex*

*Corp.*, 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affirmations are more credible. 10A *Wright & Miller, Federal Practice and Procedure*, § 2726. Rather, credibility determinations must be left to the fact-finder. *Id.* However, the mere existence of a scintilla of evidence in support of the nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The inquiry, then, is whether reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Id.*

In ruling on a motion for summary judgment, "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), cert. denied, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990). Thus, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties. The Rule 56 evidence includes the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted. Fed. R. Civ. P. 56(c).

## III.   ANALYSIS

### A.  Plaintiff's Claim for Sex Discrimination in Violation of Title VII

Plaintiff alleges that Defendant discriminated against her on the basis of her sex. Specifically, Plaintiff alleges that Defendant did not restore her leave hours from 2011 and denied

11

her request to increase the ceiling on the number of leave hours that she could accumulate because Plaintiff is a woman.

To establish a prima facie claim of sex discrimination under Title VII, Plaintiff must satisfy the three-step burden-shifting inquiry set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-803, 903 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To establish a *prima facie* claim, Plaintiff must show (a) that she was a member of a protected class, (b) she was subjected to an adverse action, and (c) another similarly situated employee, not in the protected class, was treated more favorably. *Scheidemantle v. Slippery Rock Univ. State Sys. Of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802-803).

If Plaintiff makes out a *prima facie* claim, the burden shifts to the Defendant to establish "a legitimate nondiscriminatory reason" for its alleged discriminatory acts. *Scheidemantle*, 470 F.3d at 539. If Defendant provides such a reason, Plaintiff "must then show that the proffered reason is merely a pretext for actual discrimination." *Id.*

Defendant does not dispute that Plaintiff can satisfy the first two elements of a prima facie claim—that Plaintiff, as a woman, is a member of a protected class and that she was subjected to an adverse action. (Doc. 15 at 3-6.) Defendant argues that Plaintiff cannot satisfy the last element, that another similarly situated employee, who is not a woman, was treated more favorably than she was treated. (*Id.*) Plaintiff argues that Thomas Lockhart and Dwaine Young are such employees. (Doc. 19 at 6.)

The test for determining whether an employee is similarly situated "is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated . . . Exact correlation is neither likely nor necessary, but the cases

12

must be fair cogeners." *Dartmouth Review v. Dartmouth*, 889 F.2d 13, 19 (1st Cir. 1989).

During the period relevant to this lawsuit, Lockhart was an Air Force employee stationed at Wright-Patterson Air Force Base. (Doc. 15-5, ¶ 1.) Lockhart was deployed on TDY to Iraq from September 2010 to February 2011 and from May 2011 to September 2011. (*Id.*) In an affidavit submitted with Defendant's Motion for Summary Judgment, Lockhart states:

> With respect to how my leave matters were regarded during and after my deployment, I did not request that any of my leave be restored and I did not request an increase in my leave ceiling from 240 to 360 hours. While I was deployed to Iraq, I accumulated leave and was able to take leave throughout the deployment. I did not accumulate sufficient leave to even warrant requesting an increase in my leave ceiling from 240 to 360 hours. I did not request any restoration of my leave during or after my temporary duty in Iraq. As far as I can recall, I did not have any leave restored during or after my temporary duty in Iraq.

(*Id.* at ¶ 3.) Based on this affidavit, Plaintiff cannot rely on Lockhart to satisfy the third element of her *prima facie* claim. Even assuming that Lockhart is a similarly situated employee, he requested neither the restoration of any leave hours nor any increase in his leave ceiling as a result of his TDY deployment to Iraq. Lockhart did not even need any such adjustments to his leave hours because he was able to take leave while on deployment. It would be impossible on these undisputed facts for a reasonable juror to conclude that Lockhart was treated more favorably than Plaintiff.

Plaintiff also cannot satisfy the third element of her *prima facie* claim based on Defendant's treatment of Dwaine Young. Young was a male co-worker of Plaintiff. (Doc. 19-1, ¶ 35.) He was the same rank as Plaintiff and worked for the same supervisor. (*Id.*) From April 6, 2010 through November 6, 2011, Young was deployed on a TDY assignment to Iraq in support of Operation Enduring Freedom. (Doc. 15-1, ¶ 18.)

Young requested and received restoration of 88 hours of annual leave from 2010 because

13

he was unable to use those hours while deployed in Iraq. (*Id.*, ¶ 17.) In addition, at the beginning of leave year 2011, Young's leave ceiling was increased from 240 hours to 360 hours. (Doc. 23-1.) On June 28, 2012, Young requested restoration of an additional 116 leave hours that were forfeited because he was unable to use them by the end of 2011. (Doc. 15-1, ¶ 18.) When reviewing his request, Nelson's office determined that Young's deployment did not support restoration of those hours because Young could have used them after he returned from Iraq in November 2011. (*Id.*) Young was told that "if there was a new exigency, which prohibited him from taking leave before the end of the 2011 leave year, then he should provide the documentation in accordance with the Memorandum of Supervisors of Civilian Employees." (*Id.*) Because Young did not provide such documentation, his 116 leave hours were not restored. (*Id.*)

Nelson's office also reviewed the increase in Young's leave ceiling from 240 hours to 360 hours. (Doc. 23-1.) It determined that the increase occurred as the result of an administrative error when he returned from deployment in 2011. (Doc. 23, ¶ 4.) Young was not entitled to the increase in his leave ceiling because he was deployed on a TDY assignment, not a TCS assignment. (Doc. 23-1.) In order to correct the administrative error, Young's leave ceiling was decreased to 240 hours and the 120 hours (the difference between 360 and 240 hours) that Young was no longer permitted to carry forward was placed in a RAL account. (Doc. 23, ¶ 4.)

The undisputed facts demonstrate that, while Young might have been similarly situated to Plaintiff, he was not treated more favorably than Plaintiff. Nelson's office applied the same rules to Young's leave hours and leave ceiling that were applied to Plaintiff's leave hours and leave ceiling. Young was permitted to restore 88 hours of leave that were forfeited while he was on TDY deployment in Iraq. Similarly, Plaintiff was permitted to restore 104 hours of leave that

14

were forfeited while she was on TDY deployment in Djibouti. Young was not permitted to restore the 116 hours that he forfeited at the end of 2011, after his return from deployment, because he could have used those hours by the end of the year and did not provide documentation of any other exigency that prevented him from using them. Plaintiff was not permitted to restore the 19.5 hours that she forfeited at the end of 2011 for the same reasons. Young was not permitted to increase his leave ceiling from 240 hours because he was on TDY deployment—just as Plaintiff was not permitted to do the same.

The only differences in the way that Young and Plaintiff were treated are explained by the differences in their respective situations. After correcting Young's leave ceiling to 240 hours from 360 hours, Nelson's office placed the 120 hours that Young had been carrying as accrued leave in a RAL account so that he would still be able to use them. These were leave hours that Young accrued through his service and carried based on the mistaken increase in his leave ceiling. Denying Young the use of those leave hours would have denied him earned vacation time when he was not responsible for the error that caused the increase in his leave ceiling.

Plaintiff's leave ceiling was never increased. Thus, Plaintiff was never required to forfeit any leave hours due to a mistaken increase in her leave ceiling. Nelson's office removed 89.5 hours from Plaintiff's RAL account because those hours were never lost. (Doc. 15-1, Ex. 11.) The hours were not lost because Plaintiff used them before January 1, 2012, when they would have been forfeited. (Doc. 15-1, Ex. 2.) Thus, if Nelson's office did not remove the 89.5 hours from Plaintiff's RAL account, Plaintiff would have been able to use the same leave hours twice—resulting in a windfall to Plaintiff of an additional 89.5 leave hours that she never earned.

Plaintiff has not shown that she could establish a *prima facie* claim of sex discrimination

15

under Title VII because the undisputed facts show that neither Lockhart nor Young were treated more favorably than Plaintiff with respect to their leave hours.

### B.  Plaintiff's Claim for Retaliation in Violation of Title VII

Under Title VII, it is "an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  A plaintiff may prove a retaliation through direct or circumstantial evidence.  If, as here, Plaintiff offers only circumstantial evidence, then the same *McDonnell Douglas* burden-shifting framework applies to the retaliation claim.  *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010).  Thus, if Plaintiff establishes a *prima facie* case, then the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for the conduct.  *Id.* at 492.  If Defendant does so, then the burden shifts back to Plaintiff to demonstrate that the "proffered reason was not the true reason for the employment decision."  *Id.* (quoting *Tuttle v. Metro Gov't of Nashville*, 474 F.3d 307, 320 (6th Cir. 2007) (internal quotation marks omitted)).

To establish a *prima facie* case of retaliation, a plaintiff must establish that: "(1) she engaged in activity protected by Title VII; (2) the exercise of her civil rights was known to the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).  To establish the element of a causal connection, Plaintiff is required to provide evidence "sufficient to raise the inference that

her protected activity was the likely reason for the adverse action." *EEOC v. Avery Dennison Corp.*, 104 F.3d 858 (6th Cir. 1997). The Sixth Circuit has held that:

> A causal link can be shown by either of two methods: (1) through direct evidence; or (2) through knowledge coupled with a closeness in time that creates an inference of causation . . . . However, temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence.

*Parnell v. West*, 1997 WL 271751, *2 (6th Cir.1997). Here, Defendant argues that Plaintiff is unable to establish the fourth element of her *prima facie* case and that, even if she could, she cannot show that Defendant's nondiscriminatory reason for its action is pretextual.

Plaintiff argues that a causal connection is evidenced by the temporal proximity between the filing of her EEO grievance in November 2011 and Defendant's investigation into Plaintiff's leave hours, which she alleges began in February 2012. (Doc. 19-1, ¶¶ 11-12.) Plaintiff further argues that Defendant's investigation and "harassment" regarding her leave hours "escalated" after the mediation resolving her grievance in July 2012. (Doc. 19 at 8 (citing Doc. 17 at 24).)

Even assuming that this temporal proximity is probative, Plaintiff must come forward with additional evidence of a causal connection to establish a *prima facie* case. *Parnell*, 1997 WL 271751 at *2. The only additional evidence cited by Plaintiff in support of her *prima facie* claim is Plaintiff's testimony that she was "treated differently than other employees." (Doc. 19 at 8.) That evidence does not support an inference that Defendant's actions were retaliatory because, as discussed above, the undisputed facts demonstrate that Plaintiff was not treated differently than her peers.

Plaintiff has failed to present evidence showing that she could establish a *prima facie* claim for retaliation under Title VII.

### C. Plaintiff Has Not Shown that Defendant's Non-Discriminatory Explanation for Its Conduct is Pretextual

17

Plaintiff failed to present sufficient evidence to establish a *prima facie* claim for sex discrimination or retaliation under Title VII. Defendant is therefore entitled to summary judgment on those claims. As additional grounds for its decision, the Court also finds that Plaintiff has failed to create a genuine issue of fact as to whether the proffered reason for Defendant's treatment of Plaintiff's leave issues are pretextual.

Defendant asserts that "all of the actions taken by Air Force employees were actions taken as part of their official job duties." (Doc. 15 at 12.) To establish that this proffered reason is pretextual, Plaintiff "must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994) (overruled on other grounds, *Geiger v. Tower Automotive*, 579 F.3d 614 (6th Cir. 2009)). Plaintiff may accomplish this objective by showing that the proffered reason has no factual basis, did not actually motivate the adverse action, or is insufficient to explain the adverse action. *Manzer*, 29 F.3d at 1084.

Plaintiff argues that she can show that Defendant's proffered reason is pretextual based on the following:

- Taylor, Plaintiff's Customer Service Representative and Timekeeper, represented to Plaintiff before her deployment that Plaintiff's "use or lose" hours would be automatically restored after she returned from Djibouti;

- Nelson and Saylor's review of Plaintiff's leave hours was allegedly outside the scope of their job responsibilities;

- Defendant froze Plaintiff's leave for one year while her leave hours were under review; and

- Nelson and Saylor allegedly used the "wrong policy" in determining the proper treatment for Plaintiff's leave hours.

(Doc. 19 at 9-11.) As discussed below, these assertions do not constitute evidence from which a

fact finder could reasonably reject Defendant's proffered reason for its conduct.

Taylor's representations regarding Plaintiff's leave hours do not provide direct evidence of any discriminatory or retaliatory animus. Rather, Plaintiff argues that such animus may be inferred from the inconsistency between Taylor's representation that Plaintiff's "use or lose" hours would be "automatically restored" and Defendant's denial of Plaintiff's request to restore certain leave hours. While Defendant ultimately determined that Plaintiff was not entitled to restoration of certain leave hours, there are no facts from which a juror could reasonably infer that Defendant reached that determination based on anything other than an analysis of the rules and regulations in accordance with their job duties. Nelson and her supervisor, Thomas, did not take any action until after they had sought and received guidance regarding Plaintiff's particular situation from Headquarters Air Force and Air Force Materiel Command. There is no evidence that the employees consulted in those departments were biased against Plaintiff because of her sex or EEO grievance. The record is also undisputed that Defendant's actions conformed to the guidance received from Headquarters Air Force and Air Force Materiel Command.

Plaintiff's assertion that Nelson and Saylor's review of Plaintiff's leave hours was outside the scope of their job duties is also unsupported. Saylor was only minimally involved in resolving Plaintiff's leave questions because of her heavy workload at the time. (Doc. 15-2 at 3.) Regardless, both Saylor and Nelson were Human Resource Specialists in Employee Relations. (*Id.* at 1; Doc. 23-1, ¶ 1.) Nelson stated in her declaration: "As part of my job duties, I was involved in researching and responding to Ms. Carol Kirkland's requests in 2012 to increase her leave ceiling and resolve matters related to her Restored Annual Leave (RAL) account." (Doc. 23-1, ¶ 2.) Nelson's statement is consistent with the documentary evidence showing that she also

19

handled the issues relating to Dwaine Young's leave hours.  (Doc. 15-1, ¶¶ 16-18 and Ex. 7.)

There is no evidence, other than Plaintiff's conclusory assertions at her deposition, supporting

Plaintiff's view of Nelson and Saylor's job duties.  *See Monk v. Potter*, 723 F. Supp. 2d 860, 873

(E.D. Va. 2010) ("[C]onclusory statements of opinion are insufficient to defeat the motion for

summary judgment.") *aff'd sub nom. Monk v. Donahoe*, 407 F. App'x 675 (4th Cir. 2011).

The fact that Defendant froze Plaintiff's leave hours also does not show that Defendant's

proffered reason is pretextual.   Plaintiff argues that "[t]here was no justification for the freezing of

[Plaintiff's] leave and the denial of her use of leave pending the determination of the proper

number of leave hours."  (Doc. 19 at 10.)  This argument fails because there is an obvious

explanation for the freezing of Plaintiff's leave hours, namely to prevent their use while Defendant

worked out how many leave hours Plaintiff was entitled to retain.   Defendant ultimately

determined that Plaintiff had a number of leave hours "restored" to her RAL account that were

never forfeited.   Had Defendant not frozen Plaintiff's hours, then Plaintiff could have used those

"restored" hours, even though she should not have had them in her account.

Plaintiff's final argument, that Nelson and Saylor applied the "wrong policy" to Plaintiff's

leave hours, fails for the same reason that Taylor's representations do not show pretext.

Specifically, the evidence demonstrates that Nelson and Saylor (to the extent that Saylor was

involved) escalated the questions regarding Plaintiff's leave hours to Headquarters Air Force and

Air Force Materiel Command.   Even if the "wrong policy" was applied, the only inference

supported by the facts is that Nelson and Saylor applied that policy at the direction of their

superiors and in accordance with their job duties.

Plaintiff has failed to create a genuine issue of fact as to whether Defendant's proffered

20

reason for their conduct is pretextual.   That failure is an additional basis for granting summary judgment to Defendant on both of Plaintiff's claims.

**IV.     CONCLUSION**

For the reasons discussed above, Defendant's Motion for Summary Judgment (Doc. 15) is **GRANTED**.   This case is **TERMINATED** on the Court's docket.


**DONE** and **ORDERED** in Dayton, Ohio, this Thursday, December 31, 2015.


s/Thomas M. Rose
_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE